# CHARLESTON

STATE *ex rel.* L. A. MAYS *v.* M. L. BROWN, WARDEN, &c.

STATE *ex rel.* S. F. NANCE *v.* M. L. BROWN, WARDEN, &c.

Submitted December 17, 1912. Decided December 19, 1912.

1. INSURRECTION—*Martial Law—Declaration—Power of Governor.*
    The governor of this state has power to declare a state of war in any town, city, district or county of the state, in the event of an invasion thereof by a hostile military force or an insurrection, rebellion or riot therein, and, in such case, to place such town, city, district or county under martial law. (p. 521).

2. SAME—*State Sovereignty — Constitutional Guaranties — Habeas Corpus.*
    The constitutional guaranties of subordination of the military to the civil power, trial of citizens for offenses cognizable by the civil courts in such courts only and maintenance of the writ of *habeas corpus* are to be read and interpreted so as to harmonize with other provisions of the Constitution, authorizing the maintenance of a military organization and its use by the executive to repel invasion and suppress rebellion and insurrection, and the presumption against intent on the part of the people, in the formulation and adoption of the Constitution, to abolish a generally recognized incident of sovereignty, the power of self-preservation in the state by the use of its military power in cases of invasion, insurrection and riot. (p. 522).

3. CONSTITUTIONAL LAW—*Declaration—Review by Courts.*
    It is within the exclusive province of the executive and legislative departments of the government to say whether a state of war exists and neither their declaration thereof, nor executive acts under the same, are reviewable by the courts, while the military occupation continues. (p. 524).

4.   INSURRECTION—*Military Commission—Trial of Offenses.*
     The authorized application of martial law to territory in a
     state of war includes the power to appoint a military com-
     mission for the trial and punishment of offenses within such
     territory.   (p. 525).

5.   SAME—*Martial Law—Power of Courts.*
     Martial law may be instituted, in case of invasion, insurrection
     or riot, in a magisterial district of a county and offenders
     therein punished by the military commission, notwithstanding
     the civil courts are open and sitting in other portions of the
     county.   (p. 525).

6.   SAME—*Martial Law—Military Commission—Trial of Offenses.*
     Acts committed in a short interim between two military oc-
     cupations of a territory for the suppression of insurrectionary
     and riotous uprisings and such in their general nature as
     those characterizing the uprising are punishable by the mili-
     tary commission within the territory and period of the mili-
     tary occupation.   (p. 526).

Petitions by S. F. Nance *et al.* for writ of *habeas corpus,*
against M. L. Brown, warden of the West Virginia Penitentiary.
                                              *Petitioners Remanded.*

*H. W. Houston* and *A. M. Belcher,* for petitioners.

*William G. Conley,* Attorney General, *George S. Wallace,* Act-
ing Judge Advocate General, and *J. O. Henson,* Assistant Attor-
ney General, for respondent.

POFFENBAGER, JUDGE:

L. A. Mays and S. F. Nance, in the custody of M. L. Brown,
warden of the Penitentiary of this State, under sentences of a
Military Commission, appointed by the Governor, to sit in a ter-
ritory corresponding in area and boundaries with the magisterial
district of Cabin Creek, in the County of Kanawha, in which the
said governor had declared a state of war to exist, by proclama-
tion duly issued and published, seek discharges and liberation
upon writs of *habeas corpus* duly issued by this Court.

Upon these writs, lack of authority in the governor to insti-
tute, in cases of insurrection, invasion and riot, martial law is de-
nied in argument.   A further contention is that his power to do
so extends only to the inauguration or establishment of a limited
or qualified form of such law, subordinate to the civil jurisdiction

and power to a certain extent; and certain provisions of the state Constitution are relied upon as working this restraint upon the executive power, among them the provision of section 4 of Article III., saying: "The privilege of the writ of *habeas corpus* shall not be suspended," and the provision of section 12 of the same article, saying: "The military shall be subordinate to the civil power; and no citizen, unless engaged in the military service of the state, shall be tried or punished by any military court, for any offense that is cognizable by the civil courts of the state." A minor question is, whether offenses committed immediately before the proclamation of martial law, but connected with the insurrection and operative therein, may be punished by a military commission, acting within the period of martial occupation and rule.

All agree as to the character and scope of martial law, unrestrained by constitutional or other limitations. The will of the military chief, in this instance the governor of the state, acting as commander-in-chief of the army, is, subject to slight limitations, the law of the military zone or theater of war. It is sometimes spoken of as a substitute for the civil law. It is said also that the proclamation of martial law ousts or suspends the civil jurisdictions. These expressions are hardly accurate. The invasion or insurrection sets aside, suspends and nullifies the actual operation of the Constitution and laws. The guaranties of the Constitution as well as the common law and statutes, and the functions and powers of the courts and officers, become inoperative by virtue of the disturbance. The proclamation of martial law simply recognizes the status or condition of things resulting from the invasion or insurrection and declares it. In sending the army into such territory to occupy it and execute the will of the military chief for the time being, as a means of restoring peace and order, the executive merely adopts a method of restoring and making effective the Constitution and laws within that territory, in obedience to his sworn duty to support the Constitution and execute the laws.

This power is a necessary incident of sovereignty. It is necessary to the preservation of the state. Subject to the jurisdiction and powers of the federal government, as delegated or surrendered up by the provisions of the federal Constitution, this

state is sovereign and has the powers of a sovereign state. Like all others, it must have the power to preserve itself. Where that power resides and how it is to be exercised are questions about which there has been some difference of opinion among jurists and statesmen. Whether the executive, without legislative authority, may exercise it, need not be discussed. Section 92 of chapter 18 of the Code confers upon the governor authority to declare a state of war in towns, cities, districts and counties in which there are disturbances by invasion, insurrection, rebellion or riot. Moreover, section 12 of Article VII. of the Constitution itself seems to confer such authority upon the governor, saying he "may call out" the military forces "to execute the laws, suppress insurrection and repel invasion." Hence, we may say the inauguration of martial law in any portion of this state by proclamation of the governor has both constitutional and legislative sanction in express terms.

The provisions against the suspension of the writ of *habeas corpus* and trial of citizens by military courts for offenses cognizable by the civil courts cannot, in the nature of things, be actually operative in any section in which the Constitution itself and the functions of the courts have been ousted, set aside or obstructed in their operation by an invasion, insurrection, rebellion or riot. In such cases, the constitutional guaranties of life, liberty and property have ceased to be operative and efficacious. The lives, liberty and property of the people are at the mercy of the invading, insurrectionary, rebellious or riotous element in control. Their will and desires, not the Constitution and laws, rule and govern. There is no court with power to grant or enforce the writ of *habeas corpus* within the limits of such territory. There is no court in which a citizen can be tried, nor any whose process can be made effective for any purpose. No doubt the Constitution and laws of the state are theoretically or potentially operative but they are certainly not in actual and effective operation. The exercise of the military power, disregarding for the time being the constitutional provisions relied upon, is obviously necessary to the restoration of the effectiveness of all the provisions of the Constitution, including those which are said to limit and restrain that power.

To ascertain the extent and purpose of the incorporation of

these restrictive provisions of the Constitution, they must be read in the light of principles developed by governmental experience in all ages and countries and universally recognized at the date of the adoption of the Constitution and not expressly abolished or precluded from operation by any terms found in the instrument. In the interpretation of contracts, statutes and constitutional provisions, words are often limited and restrained to a scope and effect somewhat narrower than their literal import, upon a presumption against intent to interfere with or innovate upon well established and generally recognized rules and principles of public policy not expressly abolished. *Railway Co.* v. *Conley & Avis*, 67 W. Va. 129, 165; *Reeves* v. *Ross*, 62 W. Va. 7; *Brown* v. *Gates*, 15 W. Va. 131; *Cope* v. *Doherty*, 2 DeG. & J. 614; *Dillon* v. *County Court*, 60 W. Va. 339. Nothing can be higher in character or more indispensable than this power of self-preservation. The experience of all civilization has demonstrated its necessity as an incident of sovereignty. In the organization of the state, its citizens likely did not intend to omit or dispense with a power vital to its very existence or the maintenance and efficiency of its powers, under circumstances which inevitably arise in the life of every state. Hence there is strong ground for a presumption in favor of the retention of the power in question, which finds support in other constitutional provisions, authorizing the maintenance of a military organization, and the use of it by the executive in the repulsion of invasion and suppression of insurrections and riots. Art. VII., sec. 12. No rebuttal of the presumption nor abolition of this sovereign power is found in any express terms of the Constitution.

The guaranties of supremacy of the civil law, trial by the civil courts and the operation of the writ of *habeas corpus* should be read and interpreted so as to harmonize with the retention in the executive and legislative departments of power necessary to maintain the existence of such guaranties themselves. It is reasonable and logical. Otherwise the whole scheme of government may fail. So interpreted, they have wide scope and accomplish their obvious purpose. The attempt to extend them further would be futile and result in their own destruction. The interruption is of short duration. It is only while military government is used as an instrument of warfare that the commander's will is law. *New Orleans* v. *Steamship Co.*, 20 Wall. 387;

*Ex parte Milligan,* 4 Wall. 2, 127. That a military occupa-
tion of a territory in a state of peace and order differs radically
from the prosecution of a war in the same territory, is well es-
tablished. *Ex parte Milligan,* cited. In the former case, the
military is subordinate to the civil power, no matter whether the
occupancy under tranquil conditions precedes or follows the mil-
itary operations. Martial law is operative only in such portions
of the country as are actually in a state of war and continues
only until pacification. Ordinarily the entire country is in a
state of peace, and, on extraordinary occasions calling for mili-
tary operations, only small portions thereof become theaters of
actual war. In these disturbed areas, the paralyzed civil author-
ity can neither enforce nor suspend the writ of *habeas corpus,*
nor try citizens for offenses nor sustain a relation of either su-
premacy or subordination to the military power, for in a prac-
tical sense it has ceased. But in all the undisturbed, peaceable
and orderly sections, the constitutional guaranties are in actual
operation and cannot be set aside. *Ex parte Milligan,* cited. In
most, if not all, of the instances in which the civil courts have
treated sentences of military commissions as void, the commis-
sions acted and the sentences were pronounced in tranquil ter-
ritory, not covered by any proclamation of martial law, in which
there was no actual war, and in which the Constitution and laws
were in full and unobstructed operation. An insurrection in a
given portion of a state or an invasion thereof by a foreign force
does not produce a state of war outside of the disturbed area. A
nation may be at war with a foreign power and yet have no oc-
casion to institute martial law anywhere within its own bound-
aries, as in the case of the United States in the war with Spain.
So, during the civil war, there were vast areas and whole states
in which there was no actual war.

It seems to be conceded that if the governor has the power to
declare a state of war, his action in doing so is not reviewable by
the courts. Of the correctness of this view, we have no doubt.
The function belongs to the executive and legislative depart-
ments of the government, and is beyond the jurisdiction and pow-
ers of the courts. There is room for speculation, of course, as to
the consequences of an arbitrary exercise of this high sovereign
power, but the people, in the adoption of their Constitution, may

well be supposed to have proceeded upon a well grounded presumption against any such action, and assumed that the evil likely to flow from an attempt to hamper and restrain the sovereign power in this respect might largely outweigh such advantages as could be obtained therefrom.    We are not to be understood as saying there would be a lack of remedy in such case.    The sovereign power rests in the people and may be exerted through the legislature to the extent of the impeachment and removal from office of a governor for acts of usurpation and other abuses of power.

Power to establish a military commission for the punishment of offenses committed within the military zone is challenged in argument; but we think such a commission is a recognized and necessary incident and instrumentality of martial government. A mere power of detention of offenders may be wholly inadequate to the exigencies and effectiveness of such government.    How long an insurrection or a war may last depends upon its character.    Such insurrections as are likely to occur in a state like this are mild and of short duration.    But no man can foresee and foretell the possibilities, and a government must be strong enough to cope with great insurrections and rebellions as well as mild ones.

That the courts of Kanawha county sit within the limits of that county and outside of the military zone does not preclude the exercise of the powers here recognized as vested in the executive of the state.    These petitioners were arrested within the limits of the martial zone.    There the process of the courts did not and could not run during the period of military occupation, and presumptively the state of affairs in that district, at the time of the military occupation and immediately before, was such as to preclude the free course and effectiveness of the civil law and the process of the court, however effective they may have been in other sections of Kanawha county.    The Constitution and laws themselves admit the obvious inadequacy and insufficiency of ordinary process and penalties in cases of insurrection by authorizing military suppression thereof.    Participants therein arrested and committed to the civil authorities could easily find means of delaying trial and liberated, on bail, return to the insurrectionary camp and continue to render aid and give encouragement by un-

lawful acts; and demonstration of their ability to do so would itself contribute to the maintenance of the uprising. The civil tribunals, officers and processes are designed for vindication of rights and redress of wrongs in times of peace. They are wholly inadequate to the exigencies of a state of war, incident to an invasion or insurrection. So the legislature evidently regards them, since it expressly authorizes the governor "in his discretion" to *declare state of war in towns, cities, districts and counties*. He is not required by any principle of international or martial law, the Constitution or statute to institute it, when proper by counties. On the contrary, the statute authorizes it as to a town, a city or a district, and he is not limited to towns, cities and districts in which the courts sit in times of peace, nor forbidden to put a town, city or district of a county under martial law rule by the sitting of courts elsewhere in the county. Section 2 of chapter 17 of the Virginia Code of 1860 was the same in principle, authorizing the governor to call forth the militia to surpress combinations for dismembering the state or establishing a separate government *in any part* of it, or for any other purpose, powerful enough to obstruct *in any part* of the state the due execution of the laws thereof, in the ordinary course of proceeding. The Virginia constitutional guaranties were then about the same as ours. There was a provision against suspension of the writ of *habeas corpus* "in any case." Art. IV., sec. 15. In these statutes, are found legislative constructions of constitutions, harmonizing with the conclusions here stated as to the relation and purposes of the constitutional provisions and also the power to place a part of a county under martial rule, notwithstanding the courts may be open in some other part thereof.

The offenses for which the petitioners were punished were committed in an interim between two successive periods of martial government. The first proclamation was raised about the middle of October, and the disturbances which had occasioned it immediately broke out again, and these offenses were of the kind and character which had made the occupation necessary. About the middle of November there was a second proclamation of a state of war. Just a few days before this second declaration, these offenses were committed, and the offenders were found within the military zone, and were arrested, tried and convicted. If the of-

fenses had been wholly disconnected with the insurrection and not in furtherance thereof, there might be doubt as to the authority of the military commission to take cognizance of them, although there are authorities for such jurisdiction and power as to any sort of offense committed within the territory over which martial law has been declared and remaining unpunished at the time of the declaration thereof.

We are not reviewing the sentences complained of, nor ascertaining or declaring their legal limits. Our present inquiry goes only to the question of legality of the custody of the respondent at the present time and under the existing conditions. The territory in which the offenses were committed is still under martial rule. It suffices here to say whether the imprisonment is, under present conditions, authorized by law, and we think it is. We are not called upon to say whether the end of the reign of martial law in the territory in question will terminate the sentences and upon that question we express no opinion.

Upon the facts set forth in the petition, we are of the opinion that the petitioners are in lawful custody, and we therefore remand them to the custody of the respondent.

*Petitioners Remanded.*

ROBINSON, JUDGE, (*dissenting*) :

The majority opinion boldly asserts that the sacred guaranties of our State Constitution may be set aside and wholly disregarded on the plea of necessity. It had long been supposed that such a doctrine was forever condemned and foreclosed in this State. It was believed that the ringing denouncement against that doctrine in the opening sentences of our Constitution was sufficient to bar it from recognition by any citizen, official, or judge. The unmistakable words were supposed to be too clear ever to endanger our people by a disregard of their meaning. Hear them : *"The provisions of the Constitution of the United States, and of this State, are operative alike in a period of war as in time of peace, and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government, and tends to anarchy and despotism."* Art. I., sec. 3.

How closely akin are these words to those that were uttered

by the Supreme Court of the United States shortly prior to the adoption of our Constitution: "The Constitution of the United States is a law for rulers and people, equally in war and in peace,. and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it which are necessary to preserve its existence." *Ex parte Milligan,* 4 Wall 120.

A decision based on that which our people have so clearly condemned and inhibited from recognition in our State government, and which the highest tribunal in the land has so plainly declared to be pernicious and to have no place in our form of government, meets my emphatic dissent.

It is not difficult to comprehend why our State Constitution contains such a clear and unmistakable protest against the disregard of constitutional guaranties under the plea of necessity. During the decade immediately preceding the making and adoption of that instrument, this doctrine of necessity was a live issue before the American people. Indeed, just at the close of the Civil War, and immediately thereafter, the doctrine was one of the foremost issues of the times. Events brought it vividly before the nation. Those who applied the doctrine during the war and at its close for the summary trial and execution of non-combatants were met with the accusation of murder from both North and South. Even in one of the counties of this State a citizen was summarily deprived of his life under the plea of military rule and the doctrine that necessity suspended the Constitution. Instances of this character, as well as the many instances of imprisonment without civil trial, caused the question to come immediately before the statesmen of the times, and, by the debates upon it, to come directly before all the people. The people had become thoroughly familiar with the subject. Great men of the North, foremost among them the illustrious Garfield, had thundered against the doctrine. And at last, the great judicial tribunal of the nation had set its seal of condemnation

upon it. *Ex parte Milligan, supra.* But even after this, and only two years prior to the assembling of our constitutional convention, the question came again before the country in the celebrated cases in North Carolina arising from the use of the militia of that State in the suppression of the Ku Klux Klan. *Ex parte Moore and others,* 64 N. C. 802. These cases, because of the marked clash between the military power and the judiciary, again made the country to notice the question and to observe that the principle of necessity, though denounced by the Supreme Court of the United States, was claimed for the purpose of ignoring the guaranties of a state constitution. And again, in the face of the most stubborn resistance from the executive and military arm of the government of North Carolina, the principle that the plea of necessity could deprive one of constitutional trial by jury was rejected, with marked emphasis, in an opinion by the eminent Chief Justice Pearson of that State.

So it was that when our constitutional convention assembled in 1872, the persistent claim that necessity could abrogate a constitutional provision naturally came to be considered. That convention saw, by the recent example in North Carolina, that notwithstanding the condemnation that this doctrine of necessity had received from the greatest and most cautious minds of the country, it was likely still to be claimed in state government. Hence, the strong men of that convention deemed it essential to make clear pronouncement against such a doctrine ever finding hold in West Virginia. They had become fully advised about the question by having been face to face with it. The people who approved and ratified the Constitution were advised by the same experience. They hated the doctrine that a Constitution might be set aside or declared inoperative at the will of an official created by that Constitution itself, as all lovers of constitutional government hate such a doctrine. Therefore, as a part of their compact of government, they adopted the forceful declaration against abrogating the guaranties of that compact, at any time, on the plea of necessity. Let us again bring that declaration to mind: "The provisions of the Constitution of the United States, and of this State, are operative alike in a period of war as in time of peace, and *any departure therefrom,* or *violation thereof,* under *the plea of necessity,* or any other plea, is *subver-*

*sive of good government,* and *tends to anarchy and despotism."* Can there be any mistake about the meaning of these words? Were they put in the Constitution for mere sound? No, they were put there to bind—to be sacredly kept.

Martial law can not rightly be sanctioned in West Virginia in the face of this constitutional declaration. For, as the majority opinion admits, martial law is a departure from the Constitution, a plain violation thereof, under the plea of necessity. It substitutes the law of a military commander for the law of the Constitution. It is the total abrogation of orderly presentment and trial by jury, so jealously guarded by the Constitution. Then, since martial law is such a plain departure from the Constitution, that instrument itself brands martial law as *subversive to good government* and as *tending to anarchy.*

Having made this general declaration against martial rule, the makers of our Constitution went further. They provided that the privilege of the writ of habeas corpus should not be suspended. This was a radical change from the Constitution of 1863, and was radically different from the Constitution of the United States. Our Constitution of 1863 had provided: "The privilege of the writ of *habeas corpus* shall not be suspended except when in time of invasion, insurrection or other public danger, the public safety may require it." The Constitution of the United States provides: "The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." But in the making of our present Constitution, in dealing with the great writ of freedom, no exception was made. Again unmistakable, imperative words were used: "The privilege of the writ of habeas corpus shall not be suspended." Art. III., sec. 4. The people clearly meant something by the change. They evidently meant exactly what they said—that the great writ, which any citizen deprived of his liberty without due form of law may command, should in no case be suspended under a claim of necessity for military rule. Having so plainly declared in general terms against the doctrine of necessity, in the former provision, as we have seen, they made this provision as to the privilege of the writ of habeas corpus to conform to that former declaration. They well knew that the exceptions contained in their former

Constitution, if retained, would lead to the temptation of encroachment on the guaranties of the Constitution they were making.  By providing that the privilege of the writ of habeas corpus should at all times be available, they were simply again providing against the claim that constitutional guaranties may be suspended on the plea of necessity; for, as long as the writ of *habeas corpus* is available, constitutional guaranties can not be ignored.  That which Blackstone said about the constitution of his country is equally applicable to ours: *"Magna Charta* only, in general terms, declared, that no man should be imprisoned contrary to law: the *habeas corpus* act points him out effectual means, as well to release himself, though committed even by the king in council, as to punish all those who shall thus unconstitutionally misuse him." Book IV., 439.  This great, effective writ, by the terms of our State Constitution, is always available to any citizen deprived of a constitutional guaranty.  Since it is so available at all times, how can any departure from the Constitution be allowed?  Indeed the provision that the privilege of the writ of habeas corpus shall not be suspended is itself virtually a prohibition against martial law, for the availability of the writ and the recognition of marital law are totally inconsistent.  "Suspension of the writ of *habeas corpus* is essentially a declaration of martial law." Messages and Papers of the Presidents, Vol. 10, page 465.  "Promulgation and operation of martial law within the limits of the Union would necessarily be a virtual suspension of the habeas corpus writ for the time being."  DeHart's Military Law, 18.  "The declaration of martial law in the State has the effect of suspending it."  Cooley, Principles of Constitutional Law, 301.  "Practically, in England and the United States, the essence of martial law is the suspension of the privilege of the writ of habeas corpus, that is, the withdrawal of a particular person or a particular place or district of country from the authority of the civil tribunals." Halleck's International Law, Vol. 1, page 502.  See also May's Constitutional History, ch. 11.  The Great Lincoln so understood it.  In his proclamations he merely suspended the writ of habeas corpus.  Messages and Papers of the Presidents, Vol. 6.  The founders of our state government really could have inhibited

martial law by no stronger terms: "The privilege of the writ of habeas corpus shall not be suspended."

Not content with the two declarations against martial law which we have seen, the founders grew even more specific. They again said: "The military shall be subordinate to the civil power; and no citizen, unless engaged in the military service of the State, shall be tried or punished by any military court, for any offence that is cognizable by the civil courts of the State." Art. III., sec. 12. There is no ambiguity in these words. He who runs may read. They directly strike at martial law; they directly inhibit martial law. For, the height of martial law is the supplanting of the civil courts by military courts. But this provision expressly ordains that military courts shall never take the place of the civil courts of the State for the trial of civil offenses. No military sentence for a civil offense can rightly stand in the face of these words. Nor can these words rightly be overlooked in order to uphold any such military sentence. To do so is to make the Constitution a rope of sand.

The men of the Constitutional Convention of 1872 had all witnessed the suspension of the privilege of the writ of habeas corpus and the trial and sentence of citizens by military courts. They had learned that departure from the Constitution, though dictated by the best of motives, was liable to abuse. Experience admonished them to guard against anything of the kind in the future of their State. They no doubt believed that, by the three provisions which we have noticed, they had banished all claim for martial law in this State. Determination to do so was plainly dictated to them by the experiences through which they had passed. By those experiences they had come to know the truth of that which Hamilton had written long years before: "Every breach of the fundamental laws, though dictated by necessity, impairs that sacred reverence, which ought to be maintained in the breast of rulers toward the constitution of a country, and forms a precedent for other breaches, where the same plea of necessity does not exist at all, or is less urgent and palpable." The Federalist, No. 25.

Can these direct provisions of our Constitution be overcome by any implication that the people meant to retain martial law whenever an executive declared it necessary? Is there a pre-

sumption, as the majority opinion claims, against intent on the part of the people to abolish martial law? Can any such presumption prevail against the direct declarations which absolutely negative any such presumption? No, the principle of martial law can not be inherently connected with any constitutional government in which the Constitution itself directly declares against the principle as our Constitution does.

It is said that the State must live. So must the citizen live and have liberty—the constitutional guaranties vouchsafed to him. The founders of our State government saw fit to exclude this claimed theory of implied or presumed right of self-defense in a State. They knew it to be absolutely unnecessary as to any State in the American Union under the Constitution of the United States. They knew that it was even more likely to lead to abuse than to good. They could well afford to disclaim it by positive prohibitions against its exercise; for the Constitution of the Union fully protected the State. Were they not consistent in denouncing and prohibiting a principle of self-defense wholly out of harmony with constitutional government, and in relying on the safety vouched to the State by the general government of the Union of which it is a part? Was not the guaranty of the great general government sufficient for the continued life of the State? That guaranty speaks plainly: "The United States shall guarantee to every State in this Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened), against domestic violence." Art. IV., sec. 4. Does the State for its preservation need methods so at variance with constitutional guaranties as is martial law when it may obtain the power of the Union to suppress even domestic violence? Can not the militia and the United States army pacify any section of the State, or the whole State, by methods strictly within the Constitution and laws? It was so believed when the Federal government was formed. Federalist, No. 42. Referring to this guaranty by the general government, a renowned author and judge, says: "This article, as has been truly said, becomes an immense acquisition of strength and additional force to the aid of any state government in case of internal rebellion or insurrection against

lawful authority." Cooley, Principles of Constitutional Law, 206. See also 1 Tucker's Blackstone, App. 367.

It is claimed that the power given by the Constitution to the Governor, as commander-in-chief of the military forces of the State, to "call out the same to execute the laws, suppress insurrection and repel invasion," authorizes a proclamation of martial law. Are these words to undo every other guaranty in the instrument? Can we overturn the many clear, direct and explicit provisions, all tending to protect against substituting the will of one for the will of the people, by merest implication from the provision quoted? That provision gives the Governor power to use the militia to execute the laws as the Constitution and legislative acts made in pursuance thereof provide they shall be executed. It certainly gives him no authority to execute them otherwise. In the execution of the laws the Constitution itself must be executed as the superior law. The Governor may use the militia to suppress insurrection and repel invasion. But that use is only for the purpose of executing and upholding the laws. He can not use the militia in such a way as to oust the laws of the land. It is put into his hands to demand allegiance and obedience to the laws. It, therefore, can not be used by him for the trial of civil offenses according to his own will and law; for, to so use it would be to subvert the very purpose for which it is put into his hands. By the power of the militia he may, if the necessity exists, arrest and detain any citizen offending against the laws; but he can not imprison him at his will, because the Constitution guarantees to that offender trial by jury, the judgment of his peers. He may use military force where force in disobedience to the laws demand it; but military force against one violating the laws of the land can have no place in the trial and punishment of the offender. The necessity for military force is at an end when the force of the offender in his violation of the laws is overcome by his arrest and detention. There may be force used in apprehending the offender, and in bringing him to constitutional justice, but surely none can be applied in finding his guilt and fixing his punishment.

It is further claimed that the statute which says that the Governor may declare a state of war in towns, cities, districts, or counties where invasion, insurrection, rebellion or riot exists, is

legislative authority for martial law. Code 1906, ch. 18, sec. 92.
The readiest answer to this argument is that a declaration of
war is not a declaration of martial law. The mere presence
of war does not set aside constitutional rights and the ordinary
course of the laws. Civil courts often proceed in the midst of
war. Again if the act could be construed to contemplate mar-
tial law, it would be plainly contrary to the provisions of the
State Constitution which we have noticed and would be utterly
invalid. Moreover, it is not within the power of a State legis-
lature, even when not so directly forbidden as in ours, to
authorize martial law. Martial law rests not on constitutional,
congressional, or legislative warrant; it rests wholly on actual
necessity. Nothing else can ever authorize it. And that neces-
sity is reviewable by the courts. These views are ably supported
by one of the most thoughtful and impartial students of the
subject of martial law that recent years has produced—himself
Judge-Advocate-General of the United States Army—G. Nor-
man Lieber. In his learned review on the subject, published
as a War Department Document, hereinafter to be specifically
cited, he says: "It has also been asserted that the principle that
the constitutional power to declare war includes the power to
use the customary and necessary means effectively to carry it on
lies at the foundation of martial law. I cannot agree to the
proposition. It is positively repudiated by those who justify
martial law on the ground of necessity alone, and the Supreme
Court of he United States stands committed to no such theory."
This is high authority, coming as it does from a military source.
The Judge-Advocate-General rests not content with individual
assertions; he resorts to the decisions and to sound reasons for
his conclusions. He repudiates the view of the minority judges
in the Milligan case. He says further: "If the question were at
the present time to arise whether the legislature of a state has
the power to declare martial law, we would, in the first place,
consult the Constitution of the United States, and there we
would find this prohibition:

'No state shall make or enforce any law which shall abridge
the privileges or immunities of citizens of the United States, nor
shall any State deprive any person of life, liberty, or property,

without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.'

"The Constitution of the United States affords protection, therefore, against the dangers of a declaration of martial law by the legislature of a State as well as against the danger of its declaration by Congress. The principle holds true both as to the United States and the States that the only justification of martial law is necessity.

"It is a well-settled principle that when a person is vested by law with a discretionary power his decision within the range of his discretion is conclusive on all, and therefore binding on the courts. This rule has been applied to the subject of martial law, and it has been contended that the officers who enforce it are acting within the range of their discretion, and are protected by the principle which makes them the judges of the necessity of the acts done in the exercise of a martial-law power. From my stand-point such an application of the principle is entirely wrong—for the reason that if martial law is nothing more than the doctrine of necessity called out by the State's right of self-defence the officer can have no discretion in the matter. He will or he will not be able to justify according to his ability to prove the necessity for his act; he will find no toleration of the plea that the necessity for his act, and therefore its justification, cannot be inquired into by the courts because he was acting within the sphere of his lawful discretion. The officer is not by any law vested with a discretion in this matter. Such a discretion and the doctrine of necessity can not exist together.

"But this necessity need not be absolute, as determined by events subsequent to the exercise of the power. The Supreme Court has, as we have already seen, laid down the rule much more favorable to the person using the power. It is worth repeating:

'In deciding upon this necessity, however, the state of the facts, as they appeared to the officer at the time he acted must govern the decision for he must necessarily act upon the information of others as well as his own observations And if, with such information as he had a right to rely upon, there is reasonable ground for believing that the peril is immediate and menacing, or the necessity urgent, he is justified in acting upon

it, and the discovery afterwards that it was false or erroneous will not make him a trespasser  But it is not sufficient to show that he exercised an honest judgment, and took the property to promote the public service; he must show by proof the nature and character of the emergency, such as he had reasonable grounds to believe it to be, and it is then for a jury to say whether it was so pressing as not to admit of delay; and the occasion such, according to the information upon which he acted, that private rights must for the time give way to the common and public good.' *(Mitchell* v, *Harmony,* 13 How. 427.)

"Under the Constitution of the United States there can never be any justification for the exercise of the military power to which these remarks relate other than the rule of necessity as thus applied."

In the North Carolina cases, *supra,* it was sought to justify the acts of the Governor on provisions of the Constitution and statutes of the State similar to those relied on in the cases before us; that is to say, that the Governor may call out the militia, and may declare a state of war to exist.  But the Constitution of that State provided exactly as ours provides: "The privilege of the writ of habeas corpus shall not be suspended."  That which was said by the Chief Justice of North Carolina, in an opinion approved by his associates, aptly applies to our own Constitution and laws, and to the cases under consideration:

"Mr. Badger, of counsel for his Excellency, relied on the Constitution, Art. XII., s. 3, 'The Governor shall be Commander-in-Chief, and have power to call out the militia to execute the law, suppress riots or insurrections, and to repel invasion,'—and on the Statute of 1869-'70, chap. 27, sec. 1—'The Governor is hereby authorized and empowered, whenever in his judgment the civil authorities in any County are unable to protect its citizens in the enjoyment of life and property, to declare such County to be in a state of insurrection, and to call into active service the militia of the State, to such an extent as may become necessary to suppress the insurrection;' and he insisted that:

'1.  This clause of the Constitution, and the statute, empowered the Governor to declare a County to be in a state of insurrection, whenever, in *his judgment,* the civil authorities are

unable to protect its citizens in the enjoyment of life and property  The Governor has so declared in regard to the County of Alamance, and the judiciary cannot call his action in question, or review it, as the matter is confided solely to the judgment of the Governor;

'2.   The Constitution and this statute, confer on the Governor, all the powers 'necessary' to suppress the insurrection, and the Governor has taken military possession of the county, and ordered the arrest and detention of the petitioner as a *military prisoner.*   This was necessary, for unlike other insurrections, it was not open resistance, but a novel kind of insurrection, seeking to effect its purpose by a secret association spread over the country, by scourging, and by other crimes committed in the dark, and evading the civil authorities, by masks and fraud, perjury and intimidation; and that,

'3.   It follows, that the privilege of the writ of *habeas corpus,* is suspended in that county, until the insurrection be suppressed.'

"I accede to the first proposition; full faith and credit are due to the action of the Governor. in this matter, because he is the competent authority, acting in pursuance of the constitution and the law  The power, from its nature, must be exercised by the executive, as in case of invasion or open insurrection.   The extent of the power is alone the subject of judicial determination.

"As to the second, it may be that the arrest and also the detention of the prisoner is necessary, as a means to suppress the insurrection.   But I cannot yield my assent to the conclusion: the means must be *proper,* as well as necessary, and the *detention* of the petitioner as a military prisoner, is not a proper means. For it violates the Declaration of rights, 'The privilege of the writ of *habeas corpus,* shall not be suspended,'—*Constitution, Art. 1, sec. 21.*

"This is an *express* provision, and there is no rule of construction, or principle of constitutional law, by which an express provision can be abrogated and made of no force by an *implication* from any other provision of the instrument.   The clauses should be construed, so as to give effect to each, and prevent conflict. This is done, by giving to Art. XII., sec. 3, the effect of allowing military possession of a county to be taken, and the arrest of all suspected persons, to be made by military authority.

but requiring, by force of Art. I., sec. 21, the persons arrested, to be surrendered for trial, to the civil authorities, on *habeas corpus,* should they not be delivered over without the writ.

"This prevents conflict with the *habeas corpus* clause, and harmonizes with the other articles of the 'declaration of rights', i. c. trial by jury, etc., all of which have been handed down to us by our fathers, and by our English ancestors, as great fundamental principles, essential to the protection of civil liberty.

"I declare my opinion to be, that the privilege of the writ .of *habeas corpus* has not been suspended by the action of his Excellency; that the Governor has power, under the Constitution and laws, to declare a county to be in a state of insurrection, to take military possession, to order the arrest of all suspected persons, and to do all things necessary to suppress the insurrection, but he has no power to disobey the writ of *habeas corpus,* or to order the trial of any citizen otherwise than by jury. According to the law of the land, such action would be in excess of his power.

"The judiciary has power to declare the action of the Executive, as well as the acts of the General Assembly, when in violation of the Constitution, void and of no effect."

No power for the recognition of martial law could be found in our Constitution, even were those provisions which directly condemn and prohibit it not in the instrument. To say that merest implication or presumption totally at variance with express inhibitions, and directly overthrowing all the important guaranties of the instrument itself, may be resorted to for the purpose of justifying martial law, introduces a new rule of constitutional construction. The constitutional purposes of the militia can not rightly be so subverted. True, the militia exists by the Constitution. But that military establishment is not raised by it ever to take the place of the Constitution, its creator. The mere raising of a militia does not signify, as the majority conceive, that it is raised for martial law. It is raised to enforce the laws by constitutional methods. It is raised to comply with the great military organization of the Federal Government, under the provisions of·the Constitution of the Union. Art. I., sec. 16.

Let us look at some guaranties of our Constitution that may now lightly be ignored by the force of the majority decision—

that may be cast aside by the Governor of this State and he not be made to answer for ignoring them. Let us see what express words of the instrument other than those already observed are torn down by this resort to mere implication and presumption. Let us see provisions which the people as a whole deemed necessary for good government, and sought to place beyond power of change, which are now held to be under the control of the commander-in-chief of the militia, by resort to a denounced plea of necessity judged by a single individual. It is well enough at least to preserve them here:

Art. III., sec. 4. "No person shall be held to answer for treason, felony or other crime, not cognizable by a justice, unless on presentment or indictment of a grand jury. No bill of attainder, *ex post facto law,* or law impairing the obligation of a contract shall be passed."

Art. III., sec. 10. "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

Art. III., sec. 14. "Trials of crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public, without unreasonable delay, and in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county. In all such trials, the accused shall be fully and plainly informed of the character and cause of the accusation, and be confronted with the witnesses against him, and shall have the assistance of counsel, and a reasonable time to prepare for his defence; and there shall be awarded to him compulsory process for obtaining witnesses in his favor."

Art. III., sec. 17. "The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be. administered without sale, denial or delay."

Can the absolute, unrestrained, and unreviewable will of the Governor be substituted for these provisions? That it may is the decision of the majority of this Court. One gross error of that decision is that it bases the right to martial law solely on the decision and proclamation of the Governor and not on *actual* necessity. No mere decision or proclamation can justify

martial law, even where it might be legally recognized. It can only be justified by the absolute necessity of fact for it. War must be so effective as to make the necessity for martial law. War must have made it wholly impossible to enforce or invoke the civil laws before martial law can be invoked. Even then the military commander is accountable before the civil laws when the exigency has passed. His judgment as to the necessity may be reviewed. There must be ultimate responsibility. It is even so as to the suspension of the writ of *habeas corpus,* when a constitution authorizes the suspension. Colley, Principles of Constitutional Law, 300. The military commander may be compelled to show reasonable ground for believing that the infringement of personal and property rights was demanded by the occasion. Stephen, History of Criminal Law, 214. . We have seen these principles enunciated by Lieber, above. See also Ballantine, *post.* And as long as there is a civil court that has the power to try an offender for breach of the civil law, martial law can not be applied for the trial of that offender. Blackstone, Book I., 413. If a civil court exists that may take cognizance, then necessity for martial trial does not exist. As long as the civil law can be executed by the presence, and operation of civil courts, martial law through military courts can not take its place. Martial law can only operate where the civil law has become inoperative by the absence of courts. It is the actual, physical annihilation of the civil courts by the war, that makes the only necessity upon which trial by martial law may ever be had. It is not merely the decision of the executive or the legislature that military courts will be more effective than the existing civil courts, that can make the necessity. Nothing short of the absence of civil resort for trial, can ever justify military trial of civil offenses. "If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, then, on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration: for, if this government is con-

tinued after the courts are re-instated, it is a gross usurpation of power." *Ex parte Milligan, supra.*

We shall now soon proceed to see how these principles, announced by the Supreme Court of the United States, sustained preeminently by the best thought of all constitutional governments, as a research will show, apply to the cases of the petitioners, Nance and Mays. But before proceeding thereto, it will be necessary to show the actual status of these cases. It may be inferred from the majority opinion that Nance and Mays are mere prisoners of war. They occupy no such relation. Nor are they merely detained by the militia in the suppression of riot, insurrection or rebellion. Their petition for writs of habeas corpus, and the returns of the warden of the penitentiary thereto make no such cases against them. Nor was it argued at the bar or in the briefs that they have any such relation. It plainly appears that they are citizens of Kanawha county, not connected with the military service, charged before a military commission for violations within that county of *certain provisions of the statutes of West Virginia amounting thereunder to misdemeanors,* arrested by the militia, tried by military commission pursuant to the order of the Governor, sentenced for specific terms in the penitentiary, and transported thereto for imprisonment for their respective terms of sentence by the approval of the Governor as commander-in-chief, all at a time when the criminal courts of Kanawha county were open, able and with full jurisdiction to try the charges against them. In other words, these petitioners are held, as the returns show, on specific sentences, one for five years, the other for two, in the penitentiary, as civil offenders tried and committed by a military court under the guidance of the following military order:

STATE CAPITOL,

Charleston, November 16, 1912.

General Orders

No. 23.

The following is published for the guidance of the Military Commission, organized under General Orders No. 22, of this office, dated November 16, 1912:

1. The Military Commission is substituted for the criminal

courts of the district covered by the martial law proclamation and all offences against the civil laws as they existed prior to the proclamation of November 15, 1912, shall be regarded as offences under the military law and as a punishment therefor, the Military Commission can impose such sentences, either lighter or heavier than those imposed under the civil law, as in their judgment the offender may merit.

2.   Cognizances of offences against the civil law as they existed prior to November 15, 1912, committed prior to the declaration of martial law and unpunished, will be taken by the Military Commission.

3.   Persons sentenced to imprisonments, will be confined in the penitentiary, at Moundsville, West Virginia.

By Command of the Governor:

C. D. ELLIOTT,

Adjutant General."

The returns of the warden do not pretend to justify his authority to hold petitioners other than under sentences for specific terms, by this military commission.   He justifies under no other commitments. ' It is to the commitments that we must look in these proceedings to determine the legality of the imprisonment. Says the great commentator: "The glory of the English law consists in defining the time, the causes, and the extent, when; wherefore, and to what degree the imprisonment of the subject may be lawful.   This it is which induces the absolute necessity of expressing upon every commitment the reason for which it is made; that the court upon an *habeas corpus* may examine into its validity."   Blackstone, Book III., page 133

What actual necessity justified the creation of this military commission and the recognition of its powers to supplant the civil courts?   As we have seen, nothing but the complete lack of power of the civil courts for the trial of the charges against Nance and Mays, arising by the annihilation and inoperation of those courts, could, if martial law was at all allowable, justify their military trial and sentence.   Could Nance and Mays have been tried for the offenses with which they were charged by the civil courts, under the ordinary forms of law, as an actual fact?   We know by the record of these cases, we know judicially, that they could have been so tried.   But an answer that is attempted is this, that the Governor by his proclamation had set off the por-

tion of the county in which the offenses were committed and the offenders were arrested, as a martial law district. Again we say the mere proclamation could not alone make the necessity. The physical status must make it. No physical status existed, like the destruction of the ordinary courts, to make it necessary to try Nance and Mays other than they would have been tried if no disturbances had existed in Cabin Creek District. Those disturbances had not interrupted the very court that would have tried them if there had been no such disturbances. Those disturbances did not physically prevent the transportation of Nance and Mays out of the riotous district to the county seat for trial. If they could be transported out of that district to Moundsville for imprisonment, as they were, they could readily have been transported to Charleston for trial. It is said that the process of the court was prevented from execution in that district by the disturbances. That made no necessity for trial there. Surely the militia which was in possession of the district could execute all process of the court, or cause the sheriff so to do. That was a very proper sphere of the militia in a riotous district. Ballantine, *post.* It can legally assist in the execution of the process of the civil courts. Thus, it may assist in the execution of the laws. But plainly it can not supplant operative civil courts. The militia must aid the courts, not supplant them. Both are created by the same Constitution. They belong to the same people. They must work in harmony as the people contemplated when they established both. The proper province of the army in such cases of disturbance as those on Cabin Creek was observed in the beginning of the government, at the time of the Whiskey Insurrection in Western Pennsylvania in 1793. "President Washington did not march with his troops until the Judge of the United States District Court had certified that the marshal was unable to execute his warrants. Though the parties were tried for treason, all arrests were made by the authority of the civil officers. The orders of the Secretary of War stated that 'the object of the expedition was to assist the marshal of the district to make prisoners.' Every movement was made under the direction of the civil authorities. So anxious was Washington on this subject, that he gave his orders with the greatest care, and went in person to see that they were carefully executed. He issued orders declaring that 'the army should not consider them-

selves as judges or executioners of the laws, but only as employed to support the proper authorities in the execution of the laws.' " Garfield's Works (Hinsdale), Vol. I., page 162.

The offenses of Nance and Mays were *cognizable* by a civil court. That is, they were capable of being tried in the proper criminal court of Kanawha county, by a jury, upon present-ment and indictment by a grand jury. The disturbances did not make it impossible to give them the constitutional course of trial. Thus no necessity justified the course pursued. No act-ual physical fact, in the widest view, prevented the operation of the direct shield of the Constitution, wherein it provides: "No citizen  *  *  *  shall be tried or punished by any military court,. for an offence that is cognizable by the civil courts of the State." The offenses charged against Nance and Mays were plainly cog-nizable by a civil court—*capable of being presented and tried there*. The only excuse for their not being tried there is that the Governor ordered otherwise. Thus the Governor alone made the necessity. Under the circumstances, in any considerate view, their trials and sentences were not by due process of law, and were grossly illegal and void.

There were no courts, other than those of justices, within the actual theater of the disturbances on Cabin Creek that could be rendered inoperative by the riotous condition there. The criminal court that pertained to that part and to the whole of the county was far from the seat of riot and wholly unaffected in its powers for regular and orderly presentment and trial. Even as to offenses cognizable only by justices, there was power and op-portunity to bring offenders from that region to trial before jus-tices in undisturbed districts of the county. But it does not even appear that the disturbances in the district rendered it impossible, by the aid of the militia there present, for the courts of justices of the peace there to mete out justice according to the civil law. The war must put the ordinary courts out of business, *out of reach,* before military courts can ever take their place. This of course may be different in foreign conquered territory where the courts of the conquered country are not in sympathy with the obligations of the conquering army to society. It can not be gainsaid that the ordinary courts for Cabin Creek District were at all times during the disturbances within reach and 'in operation. The militia could reach them with prisoners for

trial much more easily than it could reach the penitentiary with prisoners for imprisonment. The state courts were more accessible than the state prison. This principle, that accessibility to the ordinary civil courts excludes resort to martial law, is established by the decision in the Milligan case in no uncertain language. We need no greater precedent.

Some of that which we have written in preceding paragraphs, is based on the assumption of the tolerance of martial law, simply of course for the purposes of argument. We reiterate that it can never be rightly tolerated in this State. Indeed martial law to the extent of trial and sentence for civil offenses anywhere within our fair land deserves no support from any student of constitutional history. Garfield, by his great argument and review of history, before the Supreme Court of the United States, in the Milligan case, convinces any thoughtful reader, in this behalf. No greater exposition of the subject, no severer condemnation of martial law as connected with constitutional government, was ever given to the world. It was given voluntarily, gratuitously, faithfully, solely in behalf of constitutional government. Yet it is but one among the many supporting the great weight of opinion on the subject. Garfield's Works (Hinsdale), Vol. I., page 143.

. The most recent review of the subject of martial law is that by Professor Ballantine, of the University of Montana. It deals with all the adjudged cases, and assures one of the soundness of its conclusions. Specific citation to it will hereinafter be made. It denies that martial law may be applied in state government. This writer says:

"It is believed that there is no warrant in the history of constitutional government for vesting in the governor, as commander of the military forces of the state the absolute discretionary power of arrest, and, as a logical consequence, of life and death, so that his command or proclamation may take the place of a statute, and convert larceny into a capital offense, in going beyond legislative power, deprive citizens unreasonably and arbitrarily of life or liberty without review in the courts. *Johnson* v. *Jones* (1867), 44 Ill. 142; *Ela* v. *Smith* (Mass. 1855), 5 Gray 121.

"The true view, undoubtedly, is that during a riot or other disturbance militia-men and their officers are authorized to act

merely as  a body of armed police with the ordinary powers of police officers.  *Franks* v. *Smith*  (Ky. 1911), 134 S. W. 484. This is as far as the actual decision goes in *Luther* v. *Borden* (1849), 7 How. 1.  Their military character cannot give them immunity for unreasonable excess of force.  The governor of a state, as commander of the militia, is merely the chief conservator of the peace, and entirely destitute of power to proclaim martial law, punish criminals or subject citizens to arbitrary military orders which he unreasonably believes to be demanded by public emergency.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*

"In a garrisoned city, held as an outpost of loyal territory, or in home districts threatened or recently evacuated by the enemy, military necessity for the public defence would certainly justify all temporary restrictions on the liberty of citizens essential to military operations, such as the extinguishment of lights, the requiring of military passes to enter or depart, and the quelling of public disorder.  But the prosecution and punishment of persons suspected of conspiracy, sedition, or disloyal practices, and of treason itself, belongs to the tribunals of the law, and not to the sword and bayonet of the military.  Where the army is not invading enemy territory of a recognized belligerent, but is in its own territory, the military authorities remain liable to be called to account either in *habeas corpus* or any other judicial proceeding for excess of authority toward citizens, no matter whether it occurred in propinquity to the field of actual hostilities or while the courts were closed, or after a proclamation of martial law."

The issue involved in these cases is a marked one:  Shall a citizen be subjected to trial before a military commission regardless of constitutional guaranties at any time the Governor may see fit, and that citizen have absolutely no redress from such procedure?  In other words:  May any citizen be absolutely within the power of the executive and the militia which has been placed in his hands?  These questions are indeed more momentous than the people of this busy era may conceive.  The affirmative answer to them annuls that true liberty which was bought by blood and sacrifice and which long has been jealously guarded and defended.  It seems necessary that we should repeat what Mr. Justice Davis said in the Milligan case:

"It is claimed that martial law covers with its broad mantle the proceedings of this Military Commission. The proposition is this: That in a time of war the commander of an armed force (if in his opinion the exigencies of the country demand it, and of which he is to judge), has the power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to the rule of his will; and in the exercise of his lawful authority cannot be restrained, except by his superior officer or the President of the United States.

"If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within the limits, on the plea of necessity, with the approval of the executive, substitute military force for and to the exclusion of the laws, and punish all persons; as he thinks right and proper, without fixed or certain rules.

"The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law, established on such a basis, destroys every guaranty of the Constitution, and effectually renders the 'military independent of and superior to the civil power'—the attempt to do which by the King of Great Britain was deemed by our fathers such an offense, that they assigned it to the world as one of the causes which impelled them to declare their independence. Civil liberty and this kind of martial law cannot endure together; the antagonism is irreconcilable and, in the conflict, one or the other must perish.

"This nation, as experience has proved, cannot always remain at peace, and has no right to expect that it will always have wise and humane rulers, sincerely attached to the principles of the Constitution. Wicked men, ambitious of power, with hatred of liberty and contempt of law, may fill the place once occupied by Washington and Lincoln; and if this right is conceded, and the calamities of war again befall us, the dangers to human liberty are frightful to contemplate. If our fathers had failed to provide for just such a contingency, they would have been false to the trust reposed in them. They knew—the history of the world told them—the nation they were founding, be its existence short

or long, would be involved in war; how often or how long continued, human foresight could not tell; and that unlimited power, wherever lodged at such a time, was especially hazardous to freemen. For this, and other equally weighty reasons, they secured the inheritance they had fought to maintain, by incorporating in a written Constitution the safeguards which time had proved were essential to its preservation. Not one of these safeguards can the President or Congress or the Judiciary disturb, except the one concerning the writ of habeas corpus.

"It is essential to the safety of every government that, in a great crisis, like the one we have just passed through, there should be a power somewhere of suspending the writ of habeas corpus. In every war, there are men of previously good character, wicked enough to counsel their fellow citizens to resist the measures deemed necessary by a good government to sustain its just authority and overthrow its enemies; and their influence may lead to dangerous combinations. In the emergency of the times, an immediate public investigation according to law may not be possible; and yet, the peril to the country may be too imminent to suffer such persons to go at large. Unquestionably, there is then an exigency which demands that the government, if it should see fit, in the exercise of a proper discretion, to make arrests, should not be required to produce the person arrested in answer to a writ of habeas corpus. The Constitution goes no further. It does not say after a writ of habeas corpus is denied a citizen, that he shall be tried otherwise than by the course of common law. If it had intended this result, it was easy by the use of direct words to have accomplished it. The illustrious men who framed that instruments were guarding the foundations of civil liberty against the abuses of unlimited power; they were full of wisdom, and the lessons of history informed them that a trial by an established court, assisted by an impartial jury, was the only sure way of protecting the citizen against oppression and wrong. Knowing this, they limited the suspension to one great right, and left the rest to remain forever inviolate. But it is insisted that the safety of the country in time of war demands that this broad claim for martial law shall be sustained. If this were true, it could be well said that a country, preserved at the sacrifice of all the cardinal principles of liberty, is not worth the cost of preservation."

A search of the books, extending over many days of labor in the investigation of this subject, discloses that no state in the Union has ever declared, by judicial decision or otherwise, principles to the extent of those announced by the majority opinion of this Court. West Virginia, born of a love for, and an adherence to, constitutional government, seems now to have departed furthest therefrom. In Colorado and Idaho arrests and extended detention by the militia for the suppressing of riot and insurrection have been upheld as authorized by the exigencies existing and as necessary for the suppression of uprisings. But further than this no state has ever gone. The Supreme Court of the United States went no further in the Moyer case, 212 U. S. 78. No court ever before upheld the action of a governor in ousting the courts of their jurisdiction as to civil offenses and in substituting himself therefor.

This State is a government of its own people. It should matter not that civil rights may at some time have been transgressed elsewhere. We should not permit them to be transgressed here. The insignia of the State bears our legend of freedom. It can not be kept unless we sacredly observe the Constitution by which all, whether guilty or innocent, are bound alike. Freedom for a West Virginian means the giving to him what his state Constitution and that of the nation guarantee to him. Nor does it matter whether that West Virginian be rich or poor, idler or laborer, millionaire or mountaineer. The Constitution is no respecter of persons.

A sense of duty has impelled the writing of this opinion. If it may in the future only cause the doctrine promulgated by the majority to be questioned, the labor will not have been in vain.

Will the reader of this opinion reserve hasty judgment against conclusions which it announces, until he has made studious examination of the citations herein and the three following expositions on the subject of martial law, together with the cases cited in them:

"Military Commissions," Garfield's Works (Hinsdale), Vol. I., page 143.

"What is the Justification of Martial Law," Lieber, War Dept. Doc. No. 79; North American Review, Nov. 1896.

"Martial Law," Ballantine, Columbia Law Review, June 1912.

The decisions and treatises relied on herein make no distinc-

tion in the test for martial law, whether in *pacific districts* or in *the theater of actual war.* In the one place as well as in the other the test is the same—the want of operative civil courts. An examination of the subject will not sustain a contention that the courts and the writers referred to were dealing only with martial law *outside of the theater of actual war.* They clearly show that martial law is as objectionable in the one place as in the other, unless it is justified by the absence of civil law.

Will the reader who refers to the decisions and treatises cited also note that there is a clear distinction between the power to use martial acts for the suppression of riot, insurrection or rebellion and the power to use martial law for the trial of civil offenses. Martial acts are one thing; martial law is another.

It may be said that the treatises referred to are not judicial in character. The same is true as to every text book of the law.

And now, how applicable are the words of David Dudley Field, that ardent advocate of constitutional government:

"I could not look into the pages of English law—I could not turn over the leaves of English literature—I could not listen to the orators and statesmen of England, without remarking the uniform protest against martial usurpation, and the assertion of the undoubted right of every man, high or low, to be judged according to the known and general law, by a jury of his peers, before the judges of the land. And when I turned to the history, legal, political, and literary, of my own country,—my own undivided and forever indivisible country,—I found the language of freedom intensified. Our fathers brought with them the liberties of Englishmen. Throughout the colonial history, we find the Colonists clinging, with immovable tenacity, to trial by jury, Magna Charta, the principle of Representation, and the Petition of Right. They had won them in the Fatherland in many a high debate and on many a bloody field; and they defended them here against the emissaries of the crown of England and against the veteran troops of France. We, their children, thought we had superadded to the liberties of Englishmen the greater and better guarded liberties of Americans." Brewer's Orations, Vol. 6, page 2154.

Additional opinion by POFFENBARGER, PRESIDENT:

The attempt, in the dissenting opinion prepared since the filing

of the Court opinion, to apply to these cases principles deemed clearly inapplicable by all concurring in the decision, renders it proper in our judgment to file an additional opinion, pointing out more specifically the grounds of distinction, and also to direct attention to the non-judicial and speculative character of much of the matter quoted in the dissenting opinion.

*The Milligan Case,* 4 Wall. 1, the opinion in which constitutes the real basis of the elaborate argument against the views of the majority of the Court, arose in the state of Indiana, in which there was no actual war nor any pretense thereof. That state was in a military, but nevertheless peaceable, district. Milligan was a citizen of the state, arrested therein upon a charge of conspiracy against the government of the United States, tried on that charge by a Military Commission, convicted and sentenced to death. The specifications under the charge were substantially as follows: That Milligan with others, in a time of actual war, set on foot a secret military organization for the purpose of overthrowing the government and conspired to seize the United States and state arsenals, and to release the prisoners of war confined in the military prison under charge of the military authorities; to arm these prisoners; to join with them such other forces as they could raise; and to march into Kentucky and Missouri and to co-operate with the rebel forces there; that the conspirators communicated with the enemy to induce them to invade the states of Kentucky, Indiana and Illinois, intending themselves to join and co-operate with the enemy in the event of such an invasion, and that they armed themselves for that purpose.

Of the character of the case, the court said: "It will be borne in mind that this is not a question of the power to proclaim martial law, when war exists in a community and the courts and civil authorities are overthrown. Nor is it a question what rule a military commander, at the head of his army, can impose on States in rebellion to cripple their resources and quell the insurrection. The jurisdiction claimed is much more extensive. The necessities of the service, during the late Rebellion, required that the loyal states should be placed within the limits of certain military districts and commanders appointed in them; and, it is urged, that this, in a military sense, constituted them the theater of military operations; and, as in this case, Indiana had been and was again threatened with invasion by the enemy, the occasion was

furnished to establish martial law.  The conclusion does not follow from the premises.  If armies were collected in Indiana, they were to be employed in another locality, where the laws were obstructed and the national authority disputed.  On her soil there was no hostile foot; if once invaded, that invasion was at an end, and with it all pretext for martial law.  Martial law cannot arise from a threatened invasion.  The necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration.  It is difficult to see how the safety of the country required martial law in Indiana.  If any of her citizens were plotting treason, the power of arrest could secure them, until the government was prepared for their trial, when the courts were open and ready to try them.  It was as easy to protect witnesses before a civil as a military tribunal; and as there could be no wish to convict, except on sufficient legal evidence, surely an ordained and established court were better able to judge of this than a military tribunal composed of gentlemen not trained to the profession of the law."

Of the class of cases to which this one belongs, and that one did not, the court said: "It follows from what has been said on this subject, that there are occasions when martial rule can be properly applied.  If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, then, on the theater of actual military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course.  As necessity creates the rule, so it limits its duration; for, if this government is continued after the courts are reinstated, it is a gross usurpation of power.  Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction.  It is also confined to the locality of actual war.  Because, during the late Rebellion it could have been enforced in Virginia, where the national authority was overturned and the courts driven out, it does not follow that it should obtain in Indiana, where that authority was never disputed, and justice was always administered.  And so in the case of a foreign invasion, martial rule may become a

necessity, in one state, when, in another, it would be 'mere lawless violence.' "

It was against the attempted misapplication of martial law to the pacific state of Indiana and her citizens, on the ground of the existence of a state of actual war in other portions of the Union, but not extending into Indiana, that the thunderous eloquence and invincible logic of Garfield, Black, McDonald and Mr. Justice Davis were directed. All of them admitted its proper application to the theater of actual war in the Southern states.

During the greater part of the period of the Civil War, the situation in most of the state of West Virginia was similar to that of Indiana. It was pacific territory, though within the lines of a military district. Here, as in Indiana and elsewhere, there were abuses of military authority on a mere pretext of necessity, since there was no actual war in it and the functions of the courts were not obstructed. Acts and practices sanctioned by the principles of martial law, when applicable, were indulged in by the military officers and soldiers. This history was fresh in the recollections of the framers of the Constitution of 1872. The friends and relatives of delegates to that convention and perhaps some of the delegates themselves had been victims of such illegal acts. To give effect to the provisions of the national and state Constitutions in all pacific territory in a period of war as in time of peace closes the avenue of such abuses of power as that condemned in the *Milligan Case*. That this was the evil the provision quoted in the dissenting opinion from Art. I. of the Constitution was intended to remedy is made manifest by the conditions and experiences in the light of which it was framed and adopted. Constitutional and statutory provisions are always to be interpreted in the light of the evils they were obviously designed to remedy, and do not, as a rule, extend beyond such purpose. No other rule of interpretation is more firmly established or more generally recognized. It is a rule of common sense.

Nor do the terms of the section above referred to justify or sustain the broad view and claim for which it is cited. It makes no reference to the theater of actual war. It does not say the constitutional provisions shall be operative in invaded, insurrectionary or rebellious portions of the state. It specifies times not places, saying the provisions shall be operative, (where they can

operate), "alike in a *period*", not a place, "of war as in time of peace." In the preceding war, the military authorities endeavored to make the existence of war in which the United States was engaged anywhere, though in a foreign country, justification for martial rule, in any or every part of the country, no matter how thoroughly tranquil its condition or free and effective the administration of the laws. Surely the framers of this provision, having so recently witnessed the impossibility of the operation of constitutions, statutes and other civil laws in areas of actual war, did not contemplate their operation in such places. We are not to presume they intended what they knew could not be. On the contrary, we naturally presume against intent to accomplish the impossible, in the absence of expression thereof. If the section said the constitutional provisions should be operative in *places* instead of *periods* of war, there would have been an expression of such intent, but the statesmen of 1872 knew what was needed as a relief from doubt as to the guaranties of life, liberty and property in pacific territory in periods of war and carefully selected apt words to accomplish that purpose without destroying a sovereign power necessary to the preservation of those guaranties themselves.

Section 3 of Art. I. is a declaration of a general principle, carried into effect by the more specific provisions referred to in the original opinion filed herein, declaring subordination of the military to the civil power and inhibiting trial of citizens by military courts for offenses cognizable by the civil courts. Their purpose is to prevent such trials in tranquil territory in which the courts have free and unobstructed operation. In the areas of actual war, however occasioned, they do not have free course. Offenses committed there are not cognizable by the civil courts, because not within their reach, and, if they are committed in aid or furtherance of the invasion, insurrection, rebellion or riot, they are punishable by a military commission appointed for the trial thereof.

The dissenting opinion confuses the occasion and conditions of a state of war with the suspension of the writ of *habeas corpus.* During the troublous times of the Civil War, there were attempted and actual suspensions of the writ in pacific portions of the country. That alone did not create war in such territory and

substitute military for civil rule. It was an express suspension of the writ in tranquil territory and no more. As the power was abused and its exercise wrought injustice, it has been forbidden by the Constitution. But there is necessarily an informal and implied suspension in every instance of actual war throughout the field of military operation, as the opinion in the *Milligan Case* and practically all other authorities admit.

While the supreme court of North Carolina in *Ex part Moore and others*, 64 N. C. 802, the opinion which is quoted at great length in the dissenting opinion filed here, claimed the writ of *habeas corpus* ran in the theater of actual war, it confessed its inability to enforce it, expressly refusing rules and attachments against the military officer, in whose custody the petitioners were, and the governor by whose direction and orders he held them and refused to obey the writ. The Chief Justice stated his final conclusion in the following terms: "The second branch of the motion, That the power of the county be called out if necessary, to aid in taking the petitioner by force out of the hands of Kirk, is as difficult of solution as the first. The power of the county, or 'posse comitatus', means *the men of the county in which the writ is to be executed:* in this instance Caswell, and that county is declared to be in a state of insurrection. Shall *Insurgents* be called out by the person who is to execute the writ, to join in conflict with the military forces of the State? It is said that a sufficient force will volunteer from other counties. They may belong to the association, or be persons who sympathize with it. But the 'posse comitatus' must come from the county where the writ is to be executed; it would be illegal to take men from other counties. This is settled law. Shall illegal means be resorted to in order to execute a writ? Again: every able-bodied man in the State belongs to the militia, and the Governor is by the Constitution 'commander-in-chief of the militia of the State', Art. III., sec 8. So the power of the county is composed of men who are under the command of the Governor; shall these men be required to violate, with force, the orders of their Commander-in-chief, and do battle with his other forces that are already in the field? In short, the whole physical power of the State is by the Constitution under the control of the Governor. The Judiciary has only a moral power. By the theory of the Constitution there can be no conflict between these two branches of the government. The writ

will be directed to the Marshal of the Supreme Court, with instructions, to exhibit it and a copy of this opinion to his Excellency, the Governor. If he orders the petitioner to be delivered to the Marshal, well; if not, following the example of Chief Justice Taney, in *Merriman's Case,* (Annual Cyclopedia, for the year 1861, page 555,) I have discharged my duty; the power of the Judiciary is exhausted, and the responsibility must rest on the Executive."

The writ having been delivered to the governor, he replied to it by a letter to the Chief Justice, in which, after reciting his proclamation of war in two counties of the state and the terrible conditions necessitating such action, he said: "Under these circumstances I would have been recreant to duty, and faithless to my oath, if I had not exercised the power in the several counties, which your Honor has been pleased to say I have exercised constitutionally and lawfully; especially as, since October 1868, I have repeatedly, by proclamations and by letters, invoked public opinion to repress these evils, and warned criminals and offenders against the laws, of the fate that must in the end overtake them, if, under the auspices of the Klan referred to, they should persist in their course. I beg to assure your Honor that no one subscribes more thoroughly than I do to the great principles of *habeas corpus,* and trial by jury. Except in extreme cases, in which beyond all question 'the safety of the State is the supreme law,' these privileges of *habeas corpus* and trial by jury should be maintained. I have already declared that, in my judgment, your Honor and all the other civil and judicial authorities are unable, *at this time,* to deal with the insurgents. The civil and the military are alike Constitutional powers—the civil to protect life and property when it can, and the military only when the former has failed. As the Chief Executive I seek to restore, not to subvert, the judicial power. Your Honor has done your duty, and in perfect harmony with you I seek to do mine. It is not I, or the military power, that has supplanted the civil authority; that has been done by the insurrection in the counties referred to. I do not see how I can restore the civil authority until I 'suppress the insurrection,' which your Honor declares I have the power to do; and I do not see how I can surrender the insurgents to the civil authority until that authority is restored. It would be a mockery in me to declare that the civil authority was unable to protect the

citizens against the insurgents, and then turn the insurgents over to the civil authority. My oath to suppport the Constitution, makes it imperative on me to 'suppress the insurrection' and restore the civil authority in the counties referred to, and this I must do. In doing this I renew to your Honor expressions of my profound respect for the civil authority, and my earnest wish that this authority may soon be restored to every County and neighborhood in the State."

This was in July, 1870. On August 15, 1870, the governor again wrote the Chief Justice, apprising him of the pacification of the two counties in question and his readiness then to make return to the writ. In this letter he said : "I assured your Honor that as soon as the safety of the State should justify it, I would cheerfully restore the civil power, and cause the said parties to be brought before you, together with the cause of their capture and detention. That time has arrived, and I have ordered Col. Geo. W. Kirk to obey the writs of *habeas corpus* issued by your Honor."

Thus the case relied upon, as denying power in a governor to declare a state of war in a county, declares exactly the opposite. Though denying power in the executive to do more than make arrests for civil offenses, under an erroneous interpretation of constitutional provisions, the decision also admits lack of power to enforce them as thus construed, and so runs to a palpable absurdity. The decision was later interpreted by Justice Dick of the same court, the Chief Justice and Justice Settle being present, upon applications for bench warrants against the governor and his subordinate officers, as harmonizing with the views of this Court on the main proposition involved. Justice Dick said : "The Constitution and laws of the State authorize and empower the Governor to organize and use the military forces of the State to suppress insurrection, &c., and the Judiciary have no jurisdiction to arrest the Governor, while acting in that capacity, *for any alleged transcending of his authority in the discharge of Executive duties.* 'The Legislative, Executive, and Supreme Judicial power of the government ought to be forever separate and distinct from each other.' Const. Art. I., sec. 8. Each of these coordinate departments has its appropriate functions, and one cannot control the action of the other, in the sphere of its constitutional power and duty. The government was formed for the ben-

efit of all the citizens of the State, and it would be of little force
and efficiency, if the Governor, (in whom is vested the supreme
Executive power of the State,) could be arrested, and thus vir-
tually deposed, by a warrant from the Judiciary, issued upon the
application of an individual citizen, for alleged excess of authority
in the performance of what the Governor may consider his exec-
utive functions.   *   *   *   The Governor is not above the law.
He is as much subject to its obligations and penalties, as the hum-
blest citizen.   But the Constitution provides a Court of Im-
peachment, as the proper forum for the trial of the Governor, for
any abuse of executive power.   After he is deposed, or his term
of office expires, he is liable to indictment and punishment for
such violations of the laws of the State, during his term of office.
*   *   *   The only difference we have as to the other parties in-
cluded in the application of the affiant, is, whether we have author-
ity to issue a warrant, which can be executed in the insurrection-
ary Counties of Alamance and Caswell, against the military offi-
cers of the Governor.   The laws of the State authorize the Gov-
ernor, under certain circumstances, to declare a County or Coun-
ties in a state of insurrection, and call out the militia to arrest in-
surgents, &c.:   See the Opinion of Chief Justice Pearson in the
case of A. G. Moore and others.   This is a discretionary power,
vested in the Governor by the Constitution and laws of the State,
and cannot be controlled by the Judiciary, but the Governor alone
is responsible to the people for its proper exercise.   The laws upon
this subject would be virtually repealed, and the powers of the
governor rendered wholly ineffectual, if it could be stopped or im-
peded by the Judiciary upon the application of insurgents, the
friends and sympathizers of insurgents, or other persons.   We
have nothing to say as to the policy of the law; as Judges, we can
only consider its legal effect.   *   *   *   We are of the opinion
that we have no authority to issue a bench warrant to the insur-
rectionary counties of Alamance and Caswell, against the mili-
tary officers and agents of the Governor, while they are acting
under his orders in suppressing the insurrection.   Outside of the
insurrectionary districts they may be arrested, as the powers of
the Court are in full force there.   The motion for a bench war-
rant against G. W. Kirk, G. W. Burgen and Alexander Ruffin is
allowed.   The warrants will be directed to the Sheriff of Wake

County, to be executed in any part of the State except the counties of Alamance and Caswell."

We hold the governor's determination of the justification or necessity for proclamation of a state war is not reviewable. So the decision, relied upon in the dissent, holds. We hold the writs of the courts do not run in the war area, or district under martial law. So that decision holds. We hold the courts cannot arrest the arm of the executive engaged in the suppression of an insurrection. So that case holds. That court endeavored to enforce the view that the non-suspension clause, relating to the writ of *habeas corpus*, limits the power of the executive in the insurgent district to the making of arrests and immediate delivery of the prisoners to the civil authorities, but admitted lack of power to enforce that view, and said, as we say, the governor was beyond the power of the judiciary and responsible only to the people, for his actions in the insurrectionary district, declared to be in a state of war.

Recurring to the argument founded upon recent observation and experience in the Civil War, at the date of the adoption of the Constitution, we find further and decisive refutation thereof in a constitutional provision and a statute not referred to in the original opinion. Section 1 of chapter 14 of the Code of 1868, in force at the date of the adoption of the Constitution of 1872, authorized the use of the militia to repel invasion and suppress insurrection and also to suppress any combination in any part of the state, too powerful to be suppressed by ordinary judicial proceedings, endangering the peace and safety of the people or obstructing the execution of the laws. Section 6 of the same chapter authorized him to cause to be *apprehended* and *imprisoned,* or compelled to leave the state all who, in time of war, insurrection or public danger, should wilfully give aid, support, or information to the enemy or insurgents, or who, he shall have just cause to believe, are conspiring or combining together to aid or support any hostile action against the United States or this state. Sections 7, 8 and 9 of that chapter show he was not limited, in the means by which to exercise this power, to the civil or judicial process of the state. He was to act upon his own judgment and select his own method of procedure. Section 21 of Article VIII. of the Constitution contained this provision: "Such parts of the

common law, and of the laws of this state as are in force when this article goes into operation, and are not repugnant thereto, shall be and continue the law of the state until altered or repealed by the legislature." It never occurred to the legislature of 1872, composed largely of the men who drafted the Constitution of that year and aided in its adoption, nor to any other subsequent one, that the provisions of chapter 14 of the Code of 1868 were repugnant to Article VIII., for they were not repealed then, while the constitutional purposes were fresh in the minds of our statesmen, nor have the large powers there given to the governor ever been taken away. On the contrary, they were re-enacted in 1882 and still remain in the Code, amplified by sections 54 and 92 of chapter 18 of the Code. None of the laws in force then were deemed to be repugnant to any of the provisions of the Constitution, relied upon by the petitioners or in the dissenting opinion, for none of them are in Article VIII:, and that article continued in force all laws not repugnant to it, among them all the laws authorizing the governor to use the military forces for the purposes and in the manner in which they were used or could have been used previously under the war constitution of 1863.

An article prepared by Judge-Advocate-General of the U. S. Army, Norman G. Leiber, relied upon in the dissenting opinion, like the decision in the *Milligan Case,* deals exclusively with rights and powers in pacific territory, not in the theater of actual war. He begins by naming the four kinds of military jurisdiction, (1) regulation of the army; (2) military rule in an enemy's territory, during occupation thereof; (3) military power in time of war, insurrection or rebellion over persons in the military service, as to obligations arising out of such emergency, and not falling within the domain of military law, nor otherwise regulated by law, an application of the doctrine of necessity, founded on the right of national self-preservation; and (4) martial law at home, or as a domestic fact; by which is meant military power exercised in time of war, insurrection or rebellion *in parts of the country retaining allegiance.* He then says: "It is to this last-mentioned kind of military jurisdiction that these remarks apply." Though he thus expressly says he is not discussing the exercise or limits of military power in the theater of actual war, insurrection or rebellion, but only the limits of such power in parts of the country retaining allegiance, necessarily tranquil

country, the dissenting opinion takes no notice of the subject of discussion and treats his observations as applicable to powers and transactions in insurrectionary territory, officially declared to be in a state of war. This is a palpable oversight or misapprehension of the true meaning of his observations and citations of authority. His quotation from the opinion in *Luther* v. *Borden,* 7 How. (U. S.) 1, shows this. · We read: "In relation to the act of the Legislature declaring martial law, it is not necessary in the case before us to inquire to what extent, nor under what circumstances, that power may be exercised by a state. Unquestionably a military government, established as the permanent government of a state, would not be a republican government, and it would be the duty of Congress to overthrow it. But the law of Rhode Island evidently contemplated no such government. It was intended merely for the crisis, and to meet the peril in which the existing government was placed by the armed resistance to its authority. It was so understood and construed by the State authorities. And, unquestionably a state may use its military power to put down an armed insurrection too strong to be controlled by the civil authority. The power is essential to the preservation of order and free institutions, and is as necessary to the States of this Union as to any other government. The State itself must determine what degree of force the crisis demands. And if the government of Rhode Island deemed the armed opposition so formidable, and so ramified throughout the State as to require the use of its military force and the declaration of martial law, we see no ground upon which this court can question its authority. It was a state of war, and the established government resorted to the rights and usages of war to maintain itself, and to overcome the unlawful opposition."

Having quoted this, Gen. Lieber said: "In regard to this case it is deserving of particular notice that it is an error to rely on it in proof of the theory that Congress has the power to declare martial law, in the sense in which we have been using that term. It is true that this was a case of so-called 'martial law' declared by the legislature, but what did the legislature mean by it? The term has no fixed meaning even at the present day; different writers still give it different meanings. When the legislature of Rhode Island made use of it in 1842 it probably was intended to have no more definite meaning than that the militia of the state was to

use its military power to suppress the enemies of the state. It was an authorization to do what was done when the military officer broke into the house of one of the enemies of the state in order to arrest him.    He was a public enemy against whom the military power had been called out.    It is evident that this is not the kind of martial law which we have been discussing."

In the face of the declaration by the Supreme Court of the United States, above quoted, it is argued that a state cannot declare a state of war and adopt the usages of war in the suppression of an insurrection, because the national government may be summoned to the aid of the state in its efforts to uphold and enforce its authority.    As the court in *Luther* v. *Borden* plainly says, that national obligation and right is in aid of the state government, not in exclusion thereof.    It was never intended that the federal government should assume the duties of state government, nor reduce the state to a condition of dependence upon the discretionary exercise of federal power respecting the maintenance of its authority within its own territory, not in conflict with the limitations of the national Constitution upon the powers of the states. The federal government assumed no obligation to do for the states what they can do for themeslves, nor laid any restraint upon their sovereign powers except in certain instances or for the accomplishment of enumerated federal purposes.    Observe that Judge Cooley said, in the quotation found in the dissenting opinion, this article of the national Constitution is an "acquisition of strength and additional force to the aid of any state government." Why should we be asked to read this as if it said "to the exclusion of the powers of any state government?"

Professor Ballentine, like Gen. Lieber, was discussing the exercise of military power in pacific territory, as a careful reading of the quotation from him shows.    He is merely stating the doctrine of the *Milligan Case.    Frank* v. *Smith*, cited by him, did not arise under a proclamation of war.    *Johnson* v. *Jones* and *Ela* v. *Smith*, are cited by him against authority of the governor, without legislative sanction, to declare war.    Here we have both legislative and express constitutional authority in the governor to do so.

The quotations from Gen. Garfield, Gen. Norman, Prof. Ballentine, David Dudley Field and others, are not judicial expressions, even if they related to the question here involved, but, worse yet, they have no application to the question.

Another distinction not marked nor indicated in the dissenting opinion runs through much of the mass of quoted matter therein from public writers. That is the distinction between the power to do an act and liability for a wrong done in the exercise of that power. We have in this case nothing to do now with claims for damages for wrongs done by the executive officers in the exercise of their powers. The opinions in the North Carolina case, relied upon in the dissenting opinion, not quoted therein, but quoted here, mark this distinction plainly. While the executive and his subordinate officers are engaged in the suppression of an insurrection, there is no power in the courts to restrain them, though there may be, after the war is over, a right of action for damages for some wrongful act, done in the exercise of the power. This principle applies in other relations. If a man has land leased for certain purposes, and, in carrying on those purposes, he does some wrongful act, he is liable for the wrong done, but that liability does not defeat his right to the use of the land. Under our tax laws, land may be sold for the nonpayment of taxes, and there may be a right, because of some error or violation of law, to avoid the sale, but, notwithstanding, the law gives no remedy to stop the sale by injunction or otherwise. Quotations of law applicable to the question of liability for wrongs done in the exercise of executive power is wholly inapplicable to the question of the power of the court to stop, restrain or interfere with the exercise thereof, and they are therefore misleading and confusing. There are many instances in which private right or interest must be subordinate to, and compelled to await the accomplishment of, great public purposes. "Members of the legislature shall, in all cases except treason, felony, and breach of the peace, be privileged from arrest during the session, and for ten days before and after the same; and for words spoken in debate, or any report, motion or proposition made in either house, a member shall not be questioned in any other place." Cons. Art. VI., sec. 17. "The following persons shall also be privileged from arrest under civil process, except for an escape, to-wit: A judge, grand juror, or witness, required by lawful authority to attend at any court or place, during such attendance, and while going to and from such court or place; officers and men, while going to, attending at, and returning from any muster or court-martial which they are lawfully required to attend;

persons attending funerals and ministers of the gospel while engaged in performing religious service in a place where a congregation is assembled and while going to and returning from such place. Such privilege shall only be on the days of such attendance, and an additional day for every twenty miles traveled in going and returning." Code (1906) ch. 41, sec. 14. "No civil process or order shall be executed on Sunday, except in cases of persons escaping from custody, or where it may be especially provided by law." Code (1906) ch. 41, sec. 15.

These provisions rest upon the obvious physical necessity, in government as elsewhere, even at post offices, railway stations, hotels, on highways and in mountain passes, of the observance of order as to time, place and methods of procedure.

Aside from the argument of presumption against the destruction or abolition of a high sovereign power by mere implication, the terms of section 12 of Article VII. of the Constitution may be invoked. This section confers power upon the governor in express terms to call out "the military forces of the state  *  *  * to execute the laws, suppress insurrection and repel invasion." Here is a constitutional grant of express power to "suppress insurrection", without limitation or prescription of the mode of exercise thereof. That grant, according to settled rules of interpretation, recognized everywhere, carries with it, by implication, all means reasonably necessary to effective exercises of the power. Under other rules, it carries such power and means as are included in the term "suppress insurrection", as defined in law. They are defined in law by the authorities relied upon in the dissenting opinion and all others as including the right to apply martial law in an insurrectionary area. It has been so understood in all countries and in all ages. So all departments of the federal government understood and applied it in the War of 1812 and the late Civil War. "The construction, given to a statute by those charged with the duty of executing it, ought not to be overruled without cogent reasons. The popular or received import of words furnishes the general rule for the interpretation of public laws as well as of private and social transactions. *  *  * When words in a statute, have acquired, through judicial interpretation, a well understood legislative meaning, it is to be presumed they were used in that sense in a subsequent statute on the same subject, unless the contrary appears." *Daniel* v.

*Simms,* 49 W. Va. 554, pts. 6, 7 and 8, syllabus. These rules are just as applicable in the interpretation of constitutional provisions as in that of statutes. This express grant of power to the executive necessarily destroys all such supposed implications as are relied upon in the dissenting opinion.

That, to justify the application of martial rule to a territory or section of a state, the courts thereof must be wholly closed and inoperative, is not sustained by the authorities cited in the dissenting opinion. Some passages in the opinion in the *Milligan Case* seem to say so, but others say the contrary. The court based its position on its judicial knowledge that "in Indiana the federal authority was always unopposed and its courts always open" and "their process unobstructed." The opinion says "after this military tribunal was ended the circuit court met, peacefully transacted its business and adjourned, * * * * * required no military aid to execute its judgments, * * * * and was never interrupted." The opinion also says that, on the theater of active military operations, where war really prevails, "there is necessity to furnish a substitute for the civil authority, * * * and it is allowed to govern by martial law until the laws can have their *free course";* and that "Martial rule can never exist where the courts are open and in the *proper and unobstructed exercise of their jurisdiction."* Having spoken of open or unobstructed courts having free course, as precluding martial law, and overthrown, obstructed or interrupted courts, as justifying it, shall we not take the opinion as having stated just what the court meant? How else may we logically and sensibly interpret its language? Can we say it meant only one of several different things mentioned as producing the same effect? No doubt they meant just what Mr. J. S. Black, the ablest of Milligan's counsel, and the greatest lawyer in the case, said of the general plan of our constitutional government in his argument: "Military force repels invasion and suppresses insurrection; you preserve discipline in the army and navy by means of courts martial; you preserve the purity of the civil administration by impeachment of dishonest magistrates; and crimes are prevented and punished by the regular judicial authorities." Of trials by military commissions, in the war areas, he said: "I have made no allusion to their history in the last five years. But what can be the mean-

ing of an effort to maintain them among us?" This was an admission of their validity in the theater of war and their invalidity in pacific territory. Milligan did not apply for his writ until after the close of the war and it was not decided until December, 1866. A sitting court whose process is obstructed by insurrectionary force is, in a practical sense, no court and might as well be "closed" or "overthrown."

In dealing with grave questions such as this, we must govern ourselves by settled rules and principles of law, including the rules of construction and interpretation. It is not permissible to set aside or ignore them in trivial cases. The greater the moment of the question or matter involved, the greater the reason for strict adherence to law and observance of distinctions in the application of principles and precedents.